## WILLIAM R. HOWELL, appellant,

*v.*

## L. CORNELIA TAYLOR, respondent.

1. A person of very moderate capacity, under favorable circumstances, may make a valid will; it appearing that he can comprehend his property, the natural objects of his bounty and the disposition he has determined to make of his property.

2. Suspicious circumstances, susceptible of an interpretation which favors honesty, are insufficient to establish undue influence in the production of an officious will.

---

On appeal from a decree of the orphans court of Camden county, which admits to probate a paper purporting to be the last will and testament of Thomas Howell, deceased.

*Mr. Charles V. D. Joline,* for the appellant.

*Mr. David J. Pancoast,* for the respondent.

THE ORDINARY.

The grounds upon which the paper admitted to probate by the decree questioned is disputed are—*first,* that the testator did not possess capacity to make a will, and, *second,* that the paper is the product of undue influence, exerted by one or more of its beneficiaries.

The proofs do not directly prove exertion of undue influence, but they exhibit a state of facts which are claimed to be *indicia* of undue influence and to raise a presumption against the instrument which has not been rebutted.

Thomas Howell was born in 1829. He had a brother named Reynolds, who was five years his senior, and a sister named Emma. His parents were first cousins. It does not appear when the parents died. The father died first. The mother made her will in February, 1851, and shortly after 1860 Thomas appears to have been living with his grandmother, consequently I infer that his mother died between 1851 and 1860. The property affected by the disputed paper is the mother's entire estate, amounting to about $18,000. By her will she put this property in the hands of Andrew M. Jones and Anthony S. Morris in trust, to invest the same and pay the income from the investments to her three children during their respective lives in equal shares. It provided that if one or more of those children should die leaving lawful issue, such issue should take their parent's share in the principal of the estate; but if there should be no issue of the child or children dying, the survivors and survivor of the three should take all. The sole survivor was given power to dispose of the estate by will.

Emma Howell, the sister, died some time in the sixties, in Georgia, without having married.

That both Reynolds and Thomas were feeble in mind cannot be doubted. Although they each lived to be more than half a century old, neither ever engaged in business nor pursued inde-

pendent work. At best, they assisted the persons with whom they lived, to some inconsiderable extent, in harvesting and gardening and by performing insignificant household errands. Reynolds died in September, 1877, and Thomas died in December, 1890.

It appears that before Mrs. Howell died she and her three children resided with her mother, Mrs. Warner, on a farm near Kirkwood, in Camden county, and that after she died her children continued to reside with their grandmother. The appellee, Cornelia Taylor, was Mrs. Howell's sister, and she also lived with her mother. Mrs. Warner died in 1867. Before that time Emma Howell went to Georgia and there died. Shortly after Mrs. Warner's death Mrs. Taylor moved to Haddonfield, taking Reynolds and Thomas Howell with her. She had two sons of her own—Carrington, who, after residing on his grandmother's farm until 1868, went to Philadelphia, where he remained until 1879, and then moved to Haddonfield, and the other, William, who has always lived with his mother. William is married and has children. Mrs. Taylor is now upwards of seventy-eight years of age and infirm.

Some two or three weeks prior to the 19th of November, 1872, William Taylor called upon the Honorable John Clement, then and now one of the judges of the court of errors and appeals of this state, and asked him to draw two wills, one for Reynolds and the other for Thomas Howell, instructing him to prepare the wills alike, so that each of them would appoint his mother, Mrs. Taylor, its executrix, and give the testator's entire estate to his, Taylor's, mother, brother and himself, in equal portions.

Judge Clement testifies that, from his general observation of Reynolds and Thomas, he regarded them as weak minded, and, so regarding them, closely questioned William Taylor as to their capacity to make a will, and that Taylor insisted that they had capacity to do so. After two or more weeks' delay, during which time the judge examined the will of Mrs. Howell, he drew the wills, and William Taylor called for them and, after paying the judge for his work, took them away.

Howell v. Taylor.

On the evening of the 19th of November, in the same year, a neighbor of the Taylors, Joseph L. Garret, and one Henry Drean, who boarded with Garret and is now dead, were called to Mrs. Taylor's, and there witnessed the signing of the wills by the brothers. At the execution of those instruments Mrs. Taylor and her son William and William's wife were present. It does not distinctly appear who sent for Messrs. Garret and Drean. Mr. Garret says that Mrs. Taylor sent for him, and William Taylor testifies that "we" sent for them.

What became of the wills immediately after they were signed and witnessed is not shown by the proofs. The will of Thomas appears to have been produced for probate by Mrs. Taylor, and it is admitted that the will of Reynolds is now in possession of Mrs. Taylor's counsel. The latter will was called for at the trial, but the orphans court thought that its introduction in evidence would not be pertinent to the issue tried. I, however, took a different view at the hearing of the appeal, and counsel put the will of Reynolds in evidence before me.

It does not appear that Carrington Taylor took any part in the production of either will, or that he knew about either until some time after both were executed.

The most important inquiry, and one which bears upon both grounds of dispute, is as to the mental capacity of Thomas Howell, and, incidentally to that inquiry, so far as it bears upon the question of undue influence, the mental condition of Reynolds Howell at the time of the execution of the wills becomes important, for the wills of both brothers were prepared and executed at the same time, apparently in pursuance of a single purpose or scheme.

As I have stated, it is established beyond question that both the brothers were feeble in mind. The witnesses agree that of the two Thomas was the more feeble minded. He could read and write his name and at times converse with some show of intelligence. He also could work in the garden and aid in harvesting and perform household errands. As to the extent of his capacity to do errands the witnesses differ. Some say that he would indicate that for which he was sent by a single word or

Howell *v.* Taylor.

would deliver a slip of paper upon which the name of the article was written, while others testify that he possessed sufficient intelligence to be able fully to state what he wanted and to pay for that which he obtained. It is also testified that sometimes he would sit listlessly for hours, mumbling and laughing to himself. His expression was vacant, yet, as one witness, a clergyman, says, there was more intelligence than idiocy in it. His articulation was indistinct and could scarcely be understood by one unaccustomed to it. He rarely answered when spoken to except by a monosyllable, but his answers were correct. He was docile, never rebellious, and so well behaved that he ate with the family and remained clean and decently dressed. The income from his estate was usually paid to some member of the Taylor family upon his signing a receipt for it, yet it is in evidence that at times he had and kept possession of considerable sums of money himself and discreetly disbursed them. It was not affirmatively and clearly proved that he ever asked or knew about his estate or that he was able to recollect his kindred, but, at the same time, it was not shown that he was without that knowledge and recollection. By inference it may be gathered that he had some comprehension of his property and some remembrance of his relatives, who were numerous. He certainly could remember the Taylors and his obligation to them.

The order of his intelligence was undoubtedly low, yet it is impossible to say that under favorable circumstances, existing at the very moment of making the will, he did not possess that "*moderate*" capacity which is recognized by the highest judicial tribunal of our state in *Waddington* v. *Buzby, 18 Stew. Eq. 173,* as sufficient to validate such a paper.

That the circumstances under which the disputed paper was executed were favorable to its validity I think appears.

The subscribing witness Garret testifies that when he entered Mrs. Taylor's house, at the time of the execution of the document, the testator told him that Judge Clement had drawn the will; that he, the testator, had read it or that it had been read to him, and that he desired Garret to be a witness to it. William

Taylor also testifies that the testator sent him to Judge Clement to have the will drawn, instructing him as to its contents.

When it is remembered that at the time the wills were made, in 1872, the Howell brothers had lived with the Taylors for several years, first at their grandmother's house and then at Mrs. Taylor's house, and that they had experienced nothing but kindness at the hands of Mrs. Taylor and her son William, of whom the testimony shows they were fond, the wills do not appear to have been inofficious. The Taylors were as near of kin to the brothers as any other relatives, and they had bestowed attention and kindness which the other relatives do not appear to have ever tendered.

Passing from the question of capacity to that of undue influence, I find these facts for consideration: That the testator was feeble in mind, and certainly of a facile disposition that rendered him liable to imposition, particularly at the hands of those in whom he reposed confidence; that one of the principal legatees personally gave instruction to the draughtsman of the will and paid him for his services; that two of the legatees, together with the wife of one of them, were present at the execution of the document, and that the will subsequently came from their possession. Also another fact, that only the survivor of the two brothers had power to dispose of the estate, yet each made a will similar to his brother's. The latter fact excites the inquiries, Why the subject of will-making was considered before the survivor was ascertained, and whether the idea of the execution of two wills at the same time and of similar character originated with the brothers or with the Taylors, who, perhaps, foresaw increasing imbecility and probably complete lack of capacity in the near future?

I think that no great significance is to be attached to the fact adverted to by counsel, that the brothers excluded each other from their wills, because by the terms of the mother's will only the testamentary disposition of the survivor would be effective, save as to some comparatively valueless personal effects, and yet, if the wills were the product of the brothers' own minds, would they not in some way, even by the gift of a thing of trifling value, have recognized each other?

28

These circumstances are sufficient to excite the judicial mind to suspicious scrutiny and naturally call upon those who participated in the production of the will and who profit by it to satisfy the court that the document was not the product of their unlawful management. We are to weigh them in the light of the testimony of William Taylor, that he was sent by the testator to Judge Clement with instructions, and in view of the statements of the subscribing witness Garret, that the testator declared that Judge Clement had drawn the will and that he, the testator, knew its contents. Also in light of the facts that the place of execution of the paper was the common home of both the Taylors and the Howells, and that the will is a just one, in that those who bestowed kindness and care upon the testator are rewarded by it, and a natural one, because in it the testator recognizes all those to whom his affection went out. Weighed in this light, I think that they are not sufficient to destroy the will.

I would, perhaps, be better assured of my conclusion if those who surrounded the testator and participated in the production of the will had explained in a more satisfactory manner that the will was the conception of the testator's own mind and was executed as his intelligent and free act. But as the case stands, I am constrained to affirm the decree of the orphans court.