## MYERS et al. v. MYERS.

No 16031.   Opinion Filed Nov. 1, 1927.

Rehearing Denied April 17, 1928.

(Syllabus.)

1. **Wills—Undue Influence—Requisites to Invalidate Will.**

Undue influence, such as will invalidate a will, must be something which destroys the free agency of the testator at the time when the instrument is made, and which, in effect, substitutes the will of another for that of the testator. It is not sufficient that the testator was influenced by the beneficiaries, in the ordinary affairs of life, or that he was surrounded by them and in confidential relations with them at the time of its execution. Mere general influence, not brought to bear on the testamentary act, is not undue influence; but in order to constitute undue influence, it must be used directly to procure the will, and must amount to coercion

destroying the free agency of the testator. Mere suspicion that undue influence was brought to bear is not sufficient to justify the setting aside of the will.

**2. Appeal and Error—Review—Sufficiency of Evidence in Equity Case.**

In a case of purely equitable cognizance, this court will review the entire record and will, if it appears that the judgment of the court below is contrary to the clear weight of the evidence, reverse the judgment of the trial court and render or cause to be rendered such judgment as should have been entered at the trial.

**3. Wills—Reversal of Judgment Refusing Probate of Will.**

The record examined, and held, that the judgment of the trial court is against the clear weight of the evidence.

Commissioners' Opinion, Division No. 1. ·

Error from District Court, Pawnee County; Edwin R. McNeill, Judge.

In the matter of probate of will of John B. Myers; Walter D. Myers et al., proponents, and Maye S. Myers, contestant. From judgment of district court, on appeal from county court, refusing probate of the will, proponents of will appeal. Reversed and remanded, with directions.

R. M. Chase, Bailey & Hammerly, and L. V. Orton, for plaintiffs in error.

McCollum & McCullum, for defendant in error.

FOSTER, C. This is an appeal by the proponents of the will of John B. Myers, deceased, from a judgment of the district court of Pawnee county denying probate of the will upon the grounds of want of testamentary capacity, fraud, and undue influence.

In the trial before the county court of Pawnee county, the will was admitted to probate. On appeal to the district court the will was denied probate on the grounds as above set out.

We have made a thorough examination of the facts in this case, which are substantially as follows:

John Myers and his wife, Maye Myers, were married about the year 1901, at the ages of 26 and 23, respectively, at which time neither of them was possessed of any large estate, each owning about $5,000 worth of property. By their united efforts they accumulated a fortune of something over $300,000, most of which was accumulated during their married life. About $50,000 was inherited by John Myers from his father's estate and some property was inherited

by Mrs. Myers, the exact amount of which is not clearly disclosed. The property belonging to Mrs. Myers, however, was transferred by her to John Myers for the reason that it could be handled better in this way.

John Myers departed this life on the 30th day of December, 1923, without issue. On the 26th day of November, 1923, he made a will disposing of his estate in the following manner: To the widow, Maye S. Myers, was given the homestead at Cleveland, the automobile, household goods and furniture, and one-third of the remainder of the estate; to Walter Myers, brother of the testator, two-ninths; to May Cox, sister of the testator, two-ninths; and to two nieces, daughters of a deceased sister, one-ninth each. Maye S. Myers, widow, and Walter D. Myers, a brother, were made joint executors of the will without bond.

The testimony shows that the relationship between the testator and the contestant, Maye S. Myers, was at all times during their life very friendly and that of devoted husband and wife. The two brothers, John and Walter, had also been devoted to each another, associated together in many business transactions, interested in several banks, and often discussed business matters together. The testator had also shown himself to be devoted to his sister, May Cox, and to the two nieces of a deceased sister; had helped in the schooling of the two nieces and shown concern in the material welfare and happiness of the brother, sister, and nieces; had often advised them about business matters and shown at least a natural, if not an extraordinary, interest in all of them.

John Myers was president, and in fact the general elected manager, of the First National Bank at Cleveland for many years prior to his death, and was a hard-working, industrious, and capable business man.

During the summer of 1923, John's health began to fail with a disease known as cirrhosis of the liver. During the months of August and September, especially, many witnesses testified, he slowed up in business, that he did not have the pep he once had, and that he was seen at his desk many times in a drowsy condition. He went to a hospital at Sand Springs during the latter part of the summer and an operation known as tapping was performed, at which time several quarts of fluid were taken from him, after which he returned to the bank, and, while he did not spend all of every day in the bank, he remained in active charge and control of the bank until by an agreement

—apparently reached between Walter, Ma.,e Myers, and himself—he was taken to the hosp.tal at Wichita, Kan., on the 6th d.y of November, 1923. He remained constantly in his bed until the 18th day of November, on which day Walter (who lived at Alva, Okla.) visited him and, according to Walter's testimony, John approached him about making a will and asked Walter to have the will prepared for him. Walter then went to an attorney in Wichita, Kan., and consulted with him about making the will. The attorney seems to have been recommended to Walter by the officers of the First National Bank at Wichita, the president and cashier of which bank both Walter and John had known practically all their lives. All of them, that is, Walter, John, and the two officers of the First National Bank at Wichita, had formerly lived at Elk City, Kan., during their boyhood days.

According to Walter's testimony, the attorney at Wichita advised him that he would charge him $35 for making the will, and he informed the attorney that he would have to take the matter up with John; and after talking with John about it, John said that was too steep and asked Walter to have his attorney in Alva, Okla., draw the will. The testimony of the attorney at Wichita is, in substance, that after his conversation with Walter he was informed that his price was too high, and at that the conference ended.

At any rate, Walter testifies that in his conversation with John on the 18th day of November, John informed him that he wanted his property divided, one-fourth to his wife, one-fourth to his sister, one-fourth to Walter, and one-eighth each to his two nieces; that he (Walter) returned to Alva; and after consultation with Mr. Chase. his attorney at Alva, he prepared the will in accordance with John's request, with the exception that on the advice of his attorney one-third was given to Maye S. Myers, because the law would not permit a husband to will away more than two-thirds of his property, but with this exception the will was prepared exactly as requested by John.

Walter returned to Wichita, Kan., on the 25th day of November, which was Sunday, and visited John in the hospital on that day. During the day, according to Walter's testimony, John asked him if he had the will prepared. These conversations were had out of the presence of Mrs. Myers or any one else.

At the time John was brought to the hospital, Mrs. Myers came with him, and re-mained with him constantly until his death, rooming right across the street from the hospital, and staying at the hospital at all times the hospital rules would permit, with the exception of taking time for meals and a little recreation. Mrs. Childs, a friend of the family and an intimate friend of Mrs. Myers, also came to Wichita a few days after John was taken there, and stayed with Mrs. Myers continuously until John's death.

After the 18th day of November, John was able to be out of his bed and walked around the hospital, took automobile rides and street car rides, and apparently, from the testimony, enjoyed these trips. According to Walter's testimony, John read the will on the 25th of November, and on the 26th mentioned the will again and asked Walter to go with him to the First National Bank at Wichita to have the will executed. While Mrs. Childs and Mrs. Myers were absent from the room it appears that John was dressed by the aid of Walter and just as they were about to leave the room Mrs. Myers and Mrs. Childs came in and asked them where they were going, to which Walter replied that they were going for a street car ride.

They did go on the street car to the First National Bank at Wichita, where, according to Walter's testimony and that of the witnesses to the will, John requested three of the officers and employees of the First National Bank to witness his will, at which place he signed the will in the presence of three witnesses, all of whom signed the same as witnesses.

After the will was executed, John and Walter remained in the bank for some time —not long—and talked over general matters with the officers of the bank, old-time friends of both Walter and John, and from the testimony of these witnesses, John was apparently in poor health, a very sick man, but his mind was clear and he was perfectly capable, according to these witnesses, of transacting business and executing a will.

After their return to the hospital from the bank, John appeared very weak and exhausted; the testimony showing, however, that on the next morning, the 27th, a minor operation known as tapping was again performed, and it appears that just prior to any of these tappings John was much more exhausted than at any other time.

In all of these conversations regarding the will, it appears that John and Walter talked the matter over personally without allowing any one to hear them, and that Walter was seen sitting by the side of the

bed talking in low tones to John on the day the will was signed and also the day before. After their return from the First National Bank, where the will was signed, Walter told Mrs. Myers, in reply to a question as to where they had been, that they had taken a street car ride and walked about a block and returned. He also told the nurse the evening after the will was executed that if John got worse and it was necessary to call Mrs. Myers, to call him also. Mrs. Myers was called during the night, but Walter was not, and the nurse said Walter remonstrated with her for not calling him.

It appears from all the testimony that the making of the will and the discussions concerning same were intentionally kept from the knowledge of Mrs. Myers. This, however, according to Walter, was at the request of John.

After the will was executed—according to the doctors and others—John gradually grew worse from a physical standpoint. But it also clearly appears that he was able for two or three weeks to be up and walk around the hospital during at least part of the day; was able to take automobile rides, receive old friends, talk with them generally about business matters, dictate letters to the officers and employees of several of his banks, giving them instructions, which letters were written by Mrs. Myers, but dictated by John. On the day after the will was executed he was able to go on an automobile ride with his niece's husband, and as late as December 6th, Mrs. Myers wrote a letter in which she said that the doctors had informed her that John would perhaps live several years, that he was able to take at least two walks about the hospital on that day and had been able to take automobile rides and enjoyed the same.

The day after the will was executed, Walter returned to his home in Alva and did not visit John any more than he had been accustomed to before the execution of the will, which was about two days in each week. Mrs. Myers was with John continuously, and other witnesses, old friends of the family who had visited John during this time, testified that he was in good mental condition and they could see nothing wrong with his mind at all. There is testimony, however, that he was drowsy a part of the time during this period and that he did not enter into conversations, but only talked when he was approached. However, about three weeks after the will was executed and some two weeks before he died, he went

into a complete state of unconsciousness, in which he remained until his death.

Some two or three years before his death he took out life insurance, $3,000 payable to his wife, $2,000 to his sister, $2,000 to Walter Myers, Jr., son of Walter Myers, and, $1,000 each to his two nieces. It appears that he did not tell any one about his taking out this insurance except Walter, whom he told at the time he made the will; but that his wife, sister, and nieces were ignorant of this fact at the time of his death.

However, some two or three years before his death he had been heard to make a statement to the effect that he did not expect to make a will at all, for the reason that the lawyers would perhaps get it if he did, or if he did not, and that his wife would get most of the property any way.

After his death he was returned to Cleveland for burial and at the funeral Mrs. Myers stated she asked Walter about the will and he told her he did not know anything about it. She also stated she asked him about it a time or two thereafter and wrote to him at Alva on about the 7th of January asking him if he knew of a will, but that she did not receive a reply to her letter. Walter, however, denies her asking him about the will, but says that he received the letter, and the reason for not answering it was that he was going to Cleveland to attend a meeting of the bank directors, at which time he told her she could find a copy of the will in the clerk's office at Pawnee. Walter had had the will filed for probate by his attorney, Mr. Chase, in Pawnee, on about the 7th day of January, 1924.

The will was executed in duplicate and both copies were given to Walter by John, according to Walter's testimony, and he took both copies of the will to Alva and placed them in his bank. According to John's instructions, Walter was to keep them until John was able to return to Cleveland, at which time he was to send one to John, and if anything happened to John that Walter was to file the will with the county judge at Pawnee, Okla.

There were several doctors who testified in the case that the disease John had would cause a mental deterioration, and others that it would not.

Walter Myers testified that he never at any time suggested the making of a will; that after John approached him about it he never even suggested how a will should be made nor exerted any influence of any nature whatsoever over John, with the sole

exception that he did tell him that his attorney had advised that he must give at least one-third of his property to his wife, as the law required him to do so, and to this John readily assented.

All of the parties to this case, according to the testimony, are in reasonably good financial circumstances; Walter being worth practically as much as John, and the sister and two nieces very well fixed financially. According to the widow's own testimony, she was left with practically $100,000 besides the household goods, the homestead, and an automobile. The rest of the estate was divided among the other heirs. The brother, sister, two nieces and the wife were the only close relatives of John Myers at the time of his death, as he died without issue. Walter said John told him he did not want any property to go to Mrs. Myer's people. There was no provision in the will regarding the property held in the name of John which really belonged to Mrs. Myers.

There is evidence to the effect that before leaving Alva to go to Wichita, at the time the will was executed, Walter wrote a letter to his daughter and son-in-law and that they arrived in Wichita on the day the will was executed, but a few hours after John and Walter had returned from the bank. There is no testimony as to what the letter contained and the son-in-law denied that the will was even suggested in the letter.

The testimony shows that as late as the 19th day of December, 1923, John Myers, at the request of his wife and Walter Myers, signed a resignation as president of one of the banks in which he was interested.

There is no intimation by the testimony, nor any contention on behalf of any of the parties, that any one attempted to exert undue influence over John Myers, with the exception of Walter Myers.

The record in this case is very voluminous, but we are convinced that the evidence clearly shows that the will was executed and published in due form as required by the laws of the state of Oklahoma, and that the testator possessed sufficient mental capacity to execute said will.

The only remaining question necessary for determination is whether or not at the time of the execution of said will the testator was free from undue influence which it is alleged was exerted over him by Walter Myers, one of the beneficiaries, who was present at the execution of said will.

In trying to arrive at a correct solution of this question, the first proposition is to determine what is undue influence. While numerous authorities are presented in briefs for both sides, it seems to be practically admitted that the definition of undue influence has been clearly set out by our Supreme Court in many cases.

In the case of In re Cook's Estate, 71 Okla. 94, 175 Pac. 507, the syllabus, as well as the body of the opinion, clearly defines the general rule (p. 96 of opinion) as follows:

"Undue influence, such as will invalidate a will, must be something which destroys the free agency of the testator at the time when the instrument is made, and which, in effect, substitutes the will of another for that of the testator. It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life, or that he was surrounded by them and in confidential relations with them at the time of its execution. Mere general influence, not brought to bear on the testamentary act, is not undue influence; but in order to constitute undue influence, it must be used directly to procure the will, and must amount to coercion destroying the free agency of the testator. Mere suspicion that undue influence was brought to bear is not sufficient to justify the setting aside of the will."

The above proposition has been consistently followed by this court in many cases, among which are the following: In re Will of Swartz, Gleason et al. v. Jones, 79 Okla. 191, 192 Pac. 203; Kindt et al. v. Parmenter et al., 83 Okla. 117, 200 Pac. 706; Nelson et al. v. York et al., 87 Okla. 210, 209 Pac. 425.

It is admitted in this case that this is an equitable proceeding and that the burden of proof is upon the contestant, after the proponents of the will have shown that the will was properly executed and that the testator was of sufficient mental capacity to execute the will. And it seems, also, to be practically admitted and quite generally established that, where undue influence is one of the grounds for the setting aside of a will and a person assists in the preparation of same and is present at the time of its execution and is a beneficiary under the will, and other beneficiaries are excluded from the presence of the testator and a confidential and fiduciary relationship exists, the presumption of undue influence arises which calls for a careful scrutiny by the court, and the burden is upon the proponent to show the absence of undue influence.

In the case at bar, Walter Myers certainly assisted in the preparation of the will, was present at the time of its execution,

and the other beneficiaries, including Mrs. Myers, were not present at the time the will was executed. So the question of whether or not a confidential and fiduciary relationship existed between Walter Myers and the testator becomes an important factor in this case.

It is contended by the proponents that no confidential relationship existed. It is true that blood relationship by itself is not enough to establish a confidential relationship. Reeves v. Howard (Iowa) 91 N. W. 896; Westergreen et al. v. Beer et al. (Cal. App.) 145 Pac. 543; Leedom et al. v. Palmer et al. (Pa.) 117 Atl. 410.

It has even been held that the relationship between father and son is not necessarily a confidential relationship. Dick v. Albers et al. (Ill.) 90 N. E. 683. Neither will natural affection alone constitute confidential relationship as it is known in law. Komp v. State (Wis.) 108 N. W. 46; In re Logan Estate (Pa.) 45 Atl. 729. Neither will mere confidence in business associates, standing alone, create this relationship. Inge v. Stillwell (Kan.) 127 Pac. 527; Barrett, Sheriff, v. Prince, 143 Fed. 302; Crawford v. Burke, 49 L. Ed. (U. S.) 147.

However, in the case at bar we have blood relationship together with natural affection and evidence of confidence in a business way existing between these two brothers at the time the will was executed. But there seems to be no testimony that the testator relied upon the business judgment of his brother, Walter Myers, nor sought out his advice and counsel before acting upon matters of importance to himself. The relationship appears, from all the testimony, to be that of two brothers, both successful in business, having a natural brotherly affection one for the other; but if any difference, Walter relying more upon the business judgment of the testator than the testator did upon that of Walter.

It is contended by the defendant in error that the proponents of this will cannot raise the question in this court, for the reason that the case was tried in the lower court upon the theory that a confidential relationship existed. But, after a careful examination of the record, we are inclined to believe that, while they may have contended that the will should stand, even though a confidential relationship did exist, they never at any time admitted in the trial court the existence of a confidential relationship such as is known in law.

We, therefore, conclude that under the circumstances in this case there was not such a relationship existing between the brother and the testator that would necessitate, under the facts in this case, an absolute shifting of the burden of proof. But it is sufficient to cause the court to be vigilant and zealous in examining the evidence to determine from all the testimony whether or not in truth undue influence was exerted.

It must, of course, be admitted that Walter Myers and the testator had a natural personal affection for one another; that they often discussed business, were interested in different enterprises, and were interested in each other's welfare; that Walter Myers had his attorney prepare the will, but from his testimony this was done at the suggestion of the testator. It is clear that the contents, as well as the preparation and execution of the will, were intentionally concealed from Mrs. Myers, the wife, not only before but after the death of the testator, until the will was actually filed for probate. This, however, according to uncontradicted testimony, was at the suggestion of the testator. There is evidence to the effect that about two years prior to the execution of the will the testator had indicated an intention never to execute a will. And while we believe that under our law this was competent testimony tending to show there was a possibility of undue influence, yet, under all the other facts and circumstances, and remembering too that at the time he made a statement that he never expected to make a will and that he further said in substance that it made very little difference whether a will was made or not, this declaration has very little force and effect.

While all these facts and circumstances might throw some cloud upon the action of Walter Myers, and his action in these matters may not be approved or might even be condemned by a large percentage of mankind, yet, owing to the fact that there is not even an intimation that Walter Myers ever so much as suggested to the testator the making of a will; that he only visited his brother two or three days each week while he was ill in the hospital at Wichita; that after the will was executed the testator maintained mental capacity for at least three weeks and on the 6th day of December (ten days after the execution of the will) was able to walk around the hospital, take several automobile rides, talk with old acquaintances about general matters, including business affairs, dictate letters addressed to the officers and employees of the business institutions in which he was interested; and the further fact that Mrs. Myers during all this time was constantly at his side, ap-

pears to us as almost conclusive evidence that no undue influence was exerted.

According to Mrs. Myers, on December 6th (ten days after the execution of the will), the testator was in such a condition that the doctor had informed her he would perhaps live many years. Under all these circumstances, it seems to us that the testator had ample opportunity to revoke his will if it was not in accordance with his wishes, that during at least three weeks after its execution he possessed ample mental capacity to have known and remembered the execution of the will and could have informed his wife about its provisions, had he so desired. Walter Myers took no more under the will than any other relative similarly situated. It is true he took more than he would have under the law had no will been executed, but he was not favored over his sister and two nieces. The property was disposed of under the will in about the same ratio as the benefits under the life insurance policies which the testator had several years before taken out for the benefit of the beneficiaries under this will. He had adopted the same policy at the time he took out the life insurance, which indicates how he expected to distribute his estate, and in addition thereto it indicates that he did not expect to inform his wife or the other beneficiaries of the distribution of his estate, as he did not tell them about the insurance.

The proponents in their brief discuss many propositions under separate headings, such as the mental capacity of the testator so as to expose him to undue influence by designing persons; physical weakness, as to its effect upon undue influence; the natural affection and kindly administration of the beneficiaries under a will; the effect of circumstances; whether or not the will is a natural or just will; suggestion from Walter Myers as to change of the will in order to be according to law; keeping the will a secret: failure to revoke the will, and several other propositions under separate and distinct heads, and cite numerous authorities showing that each of these different propositions is not sufficient in itself to set aside a will.

However, we believe, as contended by contestant, that each of these propositions is overlapping and interwoven in such a manner that it is not possible, nor proper, to consider each separately. But all of the facts and circumstances taken together should be considered in arriving at a true and proper finding of this case.

After a careful consideration of all the facts and circumstances, we are of the opinion that at the time of the execution of this will the testator was not acting under undue influence, as defined by this court, and that the will should stand. We may not approve of the action of Walter Myers in not informing the widow of the execution of the will and evading the question every time it was presented to him. This is the strongest circumstance, in our opinion, which contestant claims indicates undue influence. But, as shown by the record in this case, the testator being a man of strong mental capacity, with a sincere affection for all of his relatives, including his wife, brother, sister, and nieces, and being, as we have found, mentally competent to make a will, any suggestion from Walter indicating he desired any special benefit under the will would, in our opinion, have met with a rebuke rather than an acquiescence on the part of the testator.

We are not unmindful of the rule established by a long list of authorities in this and other states that in equity cases "the finding of the trial court should be sustained unless it appears that its findings are clearly against the weight of the evidence."

On the other hand, however, the rule is just as well established that "this court shall weigh the evidence and render a judgment here, such as the lower court should have rendered, if we find that the judgment of the lower court is clearly against the weight of the evidence."

Keeping in mind both of the well-established rules as above set out, and after a thorough consideration of all the facts and circumstances presented in this case, we are of the opinion that the findings of the trial court were clearly against the weight of the evidence.

For the reasons herein given, the judgment of the district court of Pawnee county, denying the will for probate, should be set aside and the cause remanded to the district court of Pawnee county, with directions to admit the will to probate; and it is so ordered.

BENNETT, TEEHEE, LEACH, and DIFFENDAFFER, Commissioners, concur.

By the Court: It is so ordered.

---

HUNT. J. (dissenting). An opinion by Commissioner Ray of the Supreme Court Commission was approved by this court and handed down in this case on March 2, 1926, affirming the judgment of the district court of Pawnee county. After procuring numer-

ous extensions of time within which to file petition for rehearing, same was finally filed herein by plaintiffs in error on May 15, 1926. After oral argument had thereon, said petition was granted, but having opposed the granting of the same, and insisted that the opinion heretofore filed herein by Commissioner Ray should be adhered to, I feel impelled to file my dissent to the opinion now submitted.

As stated in the instant opinion, this appeal is from the judgment of the district court denying probate of the will on the ground of want of testamentary capacity, fraud, and undue influence, and is therefore a case of purely equitable cognizance. The rule is well established that in such cases the findings of the trial court should be sustained unless it appears that same are clearly against the weight of the evidence.

We have carefully considered the instant opinion, together with the original opinion filed herein by Commissioner Ray, and have also reviewed the very voluminous record on which this appeal is based, and can come to no other conclusion than that the judgment of the district court herein was not only not clearly against the weight of the evidence, but that there is an abundance of competent and convincing evidence in this record supporting said judgment of the trial court, and the same should therefore be affirmed.

I desire to incorporate herein the opinion of Commissioner Ray reported in the Oklahoma Appellate Court Reporter bearing date of March 5, 1926, being volume 37, at page 562, and to adopt same as my dissent to the instant opinion. Same being as follows:

**Wills—Denial of Probate—Appeal — Affirmance.**

Where probate of a will is contested upon the ground of want of testamentary capacity and undue influence, and the judgment of the lower court denying the will to probate is not clearly against the weight of the evidence, the judgment will be affirmed.

(Syllabus by Ray, C.)

Commissioners' Opinion, Division No. 1.

Error from District Court, Pawnee County; Edwin R. McNeill, Judge.

In the matter of the probate of the will of John B. Myers, deceased. From judgment for Maye S. Myers, contestant, denying the will to probate, Walter D. Myers and others, proponents, have appealed. Affirmed.

R. M. Chase, Frank M. Bailey, Harry Ham-

merly, and L. V. Orton, for plaintiffs in error.

McCollum & McCollum and N. E. McNeill, for defendant in error.

Opinion by RAY, C. This appeal is by the proponents of the will of John B. Myers, deceased, from a judgment of the district court of Pawnee county, denying probate upon the grounds of the want of testamentary capacity, fraud, and undue influence.

As to the execution and publication of the will, and the testamentary capacity of the decedent, it may be said that the evidence shows the instrument was executed and published in due form as required by the law of this state, and the testator was of sufficient mental capacity to make a will, if free from undue influence. This leaves but one question to be decided: Was the finding of the court below that the execution of the will was induced by fraud and undue influence contrary to the clear weight of the evidence?

The evidence shows that the testator, John B. Myers, and the contestant, Maye S. Myers, were married in 1901 at the ages of 27 and 23 years, respectively. At the time of their marriage their estates were small and about of equal value. By their joint efforts, industry, and frugality, they accumulated an estate of approximately $300,000, less about $50,000, which came to the testator from his father's estate some two or three years before the death of the testator, December 30, 1923.

By the terms of the will the following disposition was made of the estate: The widow, Maye S. Myers, was given the homestead in Cleveland, the household goods, and the automobile, and one-third of the estate; Walter D. Myers, brother of the testator, two-ninths of the estate; Mrs. Cox, his sister, two-ninths, and each of two nieces, daughters of a deceased sister, one-ninth. Walter D. Myers, the brother, and Maye S. Myers, widow, were made joint executors of the will without bond.

The record discloses that the marital relations of the testator and the contestant were that of people devoted to each other. As to the relations between the testator and the other beneficiaries named in the will, the record discloses that a bond of close affection existed between them. The testator and his brother, Walter D. Myers, had been closely associated in business and had been confidential advisors of each other. The testator had been a business associate and advisor of his sister, Mrs. Cox, and also of the husbands of each of the two nieces. He had

aided and assisted in the schooling and in the support of the two nieces in their girlhood days, and had given every evidence of concern and affection for the welfare and material success of all of them. Sometime before his .death, without the knowledge of any of the parties, the testator had taken out life insurance for the benefit of his wife, Maye S. Myers, in the sum of $3,000; for his sister, Mrs. Cox, $2,000; for his nephew, Walter D. Myers, Jr., son of Walter D. Myers, $2,-000, and for each of his nieces the sum of $1,000.

The evidence shows that the testator was an active and aggressive business man at all times until his health began to fail, something like a year before his death. About the last of August, 1923, his ailment was found to be cirrhosis of the liver. In September, when the dropsical condition was first discovered, the testator, in company with his local physician, went to Sand Springs and was tapped, several quarts of fluid being taken from his abdominal cavity. As a result of the malady he went into a general and gradual decline. Toward the last of October his condition was such that Walter D. Myers, his brother, who was a resident of Alva and engaged in the banking business at that place, was called to Cleveland for a consultation. It was then decided that the testator should be placed in a hospital under the care of a specialist. It was agreed that Walter D. Myers should make arrangements to place him in a hospital at Wichita, Kan. Pursuant to that agreement such arrangements were made, and on the 4th day of November, the decedent left Cleveland for Wichita, accompanied by his wife and Mrs. Childs, a friend of the family and an intimate friend of Mrs. Myers. When they reached Wichita they were met by the brother, Walter D. Myers, according to previous arrangements. After the consultation with the physician the decedent was, on the 6th day of November, placed in St. Anthony's hospital. Mrs. Myers and her friend, Mrs. Childs, took up their residence at a rooming house across the street from the hospital, and spent their time at the hospital with the testator, consistent with the hospital regulations, with the exception of such times as they were out for exercise and meals. November 7th the testator was tapped and eight or ten quarts of fluid taken from him. This operation was repeated every seven or eight days with similar results until his death. The evidence shows that as a result of the accumulation of the fluid the testator was uncomfortable and restless; that after being tapped he was less uncom-

fortable and felt better. For about two weeks after he entered the hospital he was confined to the bed. Narcotics were sometimes administered. The evidence shows that during such times he was often in a stupor and failed to respond when spoken to. For a period following the first two weeks he was able to be up and walk around the hospital, into the smoking room to smoke, talk with his friends, and often went out of the hospital for a short walk in company with his wife. His condition was described by the attending physician and his assistants as a gradual decline from the time he entered the hospital until he went into a stupor about two weeks before his death, then into complete coma and death December 30th.

The purported will was executed and published November 26th, just 20 days after he entered the hospital and 34 days before his death. without the knowledge of Mrs. Myers, the widow, or anyone connected with the hospital. The contestant's evidence shows that on the morning of the 26th, the day the will was executed, Mrs. Myers, Mrs. Childs, and Walter D. Myers were in and around the hospital. At times, when no one was in the room but Walter D. Myers and the testator, they carried on a conversation in low tones so that the nurse when entering the room could not hear what was being said. The nurse's testimony was that when she entered the room she found Walter D. Myers sitting close to the bed, with his hand on the bed, talking in a low tone, but when she entered the room the conversation would cease, and Walter D. Myers would get up and walk around the room. Mrs. Myers and Mrs. Childs testified that when they returned from lunch about 12 o'clock, Walter D. Myers was dressing his brother; that Mrs. Myers asked Walter what they were going to do and he replied that his brother wanted to take a walk; that they left the hospital together and were gone for a considerable length of time; that when they returned the testator was in an exhausted condition, and Mrs. Myers asked Walter Myers where they had been, and he replied, in substance, that they had taken a street car ride, got out and walked one block, caught the next car and came back. The evidence shows they had, as a matter of fact, taken a street car, and gone down into the city of Wichita and to the First National Bank, where the will was executed, witnessed by officials of the bank, boyhood friends of the testator and his brother, Walter D. Myers. The evidence further shows that Walter D. Myers, with Mrs. Maye S. Myers and Mrs. Childs and others, accompanied the body from Wichita to Cleve-

land for the funeral ceremonies and burial January 2nd.

Mrs. Myers' testimony was that while Walter D. Myers was in Cleveland attending the funeral services, she asked him if he knew whether the deceased had made a will; he replied that he did not know; that on the 5th of January she wrote Walter D. Myers at Alva, and asked him specifically if, among the papers he had there, the decedent had a will; she received no reply to that letter; that Walter D. Myers returned to Cleveland for a meeting of the stockholders and directors of the First National Bank, of which the testator had been president for a number of years; that at that time she again asked him if he knew whether there was a will, and he answered in the negative, but later indicated to her that there probably was a will, and that she could get a copy of it by writing to Pawnee. The evidence further shows that the will was filed in the county court of Pawnee county January 7th, by an attorney acting for Walter D. Myers, together with the petition for letters testamentary to be issued to Walter D. Myers and Maye S. Myers, which was done without the knowledge of Maye S. Myers and before she knew there was a will. Contestant's evidence shows that the testator had on two occasions two or three years prior to his death made remarks clearly indicating that it was not his intention to make a will.

The attending nurse testified that, following the return of the testator and Walter Myers on the day the will was executed, the testator appeared to be exhausted and was very restless and suffered considerably that afternoon and night; that he was given opiates to relieve him, and that because of his condition they called Mrs. Myers, his wife, to come to the hospital. She further testified that on that afternoon Walter D. Myers told her, the nurse, that if they at any time called Mrs. Myers to come to the hospital to call him also. She said that she did not call Walter Myers, and on the following day he remonstrated with her for not having done so. The testator was tapped on the morning of the 27th, and several quarts of fluid taken from him.

It is clear from the evidence that the testator never at any time had any conversation with anyone relating to the will except with his brother, Walter D. Myers, and the few remarks made by him to the attending witnesses at the time the will was executed.

The testimony of Walter D. Myers, as to the circumstances of the execution of the will, is fairly set out in narrative form in the brief of the proponents as follows:

"On this trip up there the 18th of November, John told me he didn't have any will made, and wanted it made out. Wanted me to help him get it fixed. He told me about how he wanted it fixed; told me to look up the law about it and see a lawyer, and I did. I saw Mr. Brooks, an attorney at Wichita, that is, connected with the First National Bank. His office is in the Beacon Building. I went there and had a talk with him. No arrangement was made with him to draft a will. I went back and told John what the result of that talk was. I told John that Brooks said he would have to look up the law, and didn't want to say at first what he would charge, but I told him I was representing my brother sick in the hospital, and didn't want to hire him until I knew what it was going to cost, and Brooks finally told me he would want $35. I told John about it. John said. 'That is a little steep.' He says, 'I could get it done in Oklahoma City for nothing.' He outlined the way he wanted the will, and all about it. He says, 'When you get to Alva, you have your lawyer fix up my will papers and have them fixed up in duplicate. Two of them just alike.' I made a memorandum at that time, how he wanted this fixed. I had that memorandum with me when I returned to Alva on the evening of the 20th. I went to Wichita the next Sunday. I took the will with me that I had had prepared under his instructions. John says, 'I want all my debts paid.' He says, 'I don't think I owe any debts, but if I do, I want them paid.' Then he says, 'I want May to have the house and furniture and the car as her individual property,' and he says 'I want the balance of my estate divided into four equal parts.' He said, 'I want May to have one part, Gertie to have one part,' and he wanted me to have one part and Helen and Bee to have one part together. The will was drawn differently from that. He told me he wanted it drawn according to law so it would stand, and I talked to my attorney, and he said John couldn't will away over two-thirds of his estate, so the outline was changed to give her one-third of the balance of the estate. I told John about that change when I returned to Wichita the 25th. He brought the subject up and he says, 'Did you get all my will papers fixed up?' And I says, 'Yes.' I says. 'We had to change it a little bit.' He says, 'How is that?' I says, 'Well, my attorney says you couldn't will away more than two-thirds of the estate. You have to will your wife one-third.' He says, 'That is all right. I want it fixed according to law so it will stand.' I suggested to him that he should give his wife more than he had suggested himself. I says. 'John.' I says, 'I am afraid May won't be satisfied with that will.' I says. 'You ought to give her more.' I says. 'I don't like to have anything to do with this and have her dissatisfied.' I says, 'She always treated me fine, and I would hate to have anything to

do with it if there was any dissatisfaction.' He says, 'I am situated different to what you are.' He says, 'You have got a bunch of children to leave your money to, and I haven't.' And he says, 'I want to leave May plenty to do her as long as she lives, but,' he says, 'I don't want her to have all of it, nor any big amount to go to her folks.' After I had told John of the advice I received as to the portion that he would have to leave his wife anyhow, he asked to see the papers. That was on Sunday, the 25th. I think it was in the forenoon, about 10 o'clock. There was nobody there when he asked for those papers except me. He asked me in the hospital if I had the papers. I told him I did. He got up and dressed and we walked around in the hospital on Monday forenoon, and we walked clear through the hospital and he says, 'I want to see those papers. Those will papers.' I says, 'I haven't them in my pocket.' He says, 'Where are they?' I told him 'They are in my grip in the reception room.' And he said then he would see them later. He was up and dressed and we had been walking around and smoking, and when noon came, the women folks, Maye, Mrs. Childs and myself started to dinner, and John walked with us just like he was going to dinner, and when we got to the front door, they went out ahead of us and he called me back and says, 'I want to see those will papers.' I took him in the reception room and opened my grip up and gave them to him. He sat down there and read them. We remained there in the reception room probably 30 minutes. I don't know exactly. He read them both. He says, 'They are all right. They suit me all right.' Said, 'I want them so they will stand.' My grip was open and he just put them in my grip. I don't remember whether there was or not anything more said that day about the will. It was on Sunday. On Monday, the 26th, he was up and dressed. We walked around and he says, 'Get those papers.' And I got the papers, and he says, 'Come on, let's take a walk,' and we went out of the hospital and we went on to the street-car line, and took the street car. He told me he wanted to go down to the First National Bank. We went down to the First National Bank and John had the papers then. I gave them to him after we left the hospital. He wanted the papers and I gave them to him. He put them in his pocket and we went and got on the street car, and went down to the First National Bank. Went into the bank together. I think we first saw Mr. Masterman after we got into the bank. He went in and sat down at the desk and took the papers out and looked at them and spoke to these men and told them he wanted them to witness his will. At the time I did not say anything to him myself about the will. John requested these other men to witness that will. I was near them when John signed them, and saw him sign them and saw the other witnesses sign. After

the witnesses had signed them, he put them in his pocket. He stayed there then a little while and talked to them. Not very long. He talked to Mr. Chandler and Mr. Masterman a little bit. He had known Mr. Masterman up in Kansas since he was a boy. He had been acquainted with Mr. Chandler same length of time. They were running a bank up there when we were small boys. They were older than he and he had been acquainted with them a good many years. After this business was transacted there in the bank, we went back to the hospital. After these papers had been executed and signed, he put them in his pocket and we walked away out of the bank. He gave them to me right after we got out of the bank. He says, 'I want you to take these papers home with you. Put them in your bank at Alva, and keep them there till I get back to Cleveland, and then I want you to bring one of them down to Cleveland. I want to put one in my box in the bank at Cleveland.' And he says, 'If anything happens to me I want you to have those papers recorded at Pawnee, Okla'."

He denied that Mrs. Myers had asked him about a will on the 2nd of January. He admitted receiving her letter of January 5th and that he did not answer it for the reason that he was to be in Cleveland and would see Mrs. Myers on the 9th, and that on the 9th she wanted to know if John had left a will, and he told her, "Yes," that it was over in his bank; that he expected it was at Pawnee, as it had been sent over there; that he did not tell her its contents, but told her to send to Pawnee and get a copy. He denied telling her that he did not know what was in the will, but told her that he and she had been designated as executors. He further testified that on the 18th of November, when his brother first spoke to him about the will, he then, for the first time, also told him about the insurance he had taken out for the benefit of the parties above referred to. He further testified that the will was drawn and executed in duplicate; that his brother wanted it that way because one might get lost or destroyed, and he wanted two of them just alike:

"He told me to take them both home with me and put them in the bank for the present, and when he got back to Cleveland, to bring one of them down there, and he wanted to put it in his bank box, and to keep the other one at Alva."

It is made to appear by the evidence that the will was executed with great secrecy for the purpose of keeping all knowledge of the transaction from the wife of the testator; that the testator and his wife had lived and worked together for a quarter of a century, and there had been no estrangement between

them; that the will was prepared under the direction of Walter D. Myers and by his attorney; that Walter D. Myers was given a much larger share of the estate by the terms of the will than he would have been entitled to without the will, and that he was made an executor without bond; that the testator left his bed, and in company with Walter D. Myers, and on his representation that they were going for a walk, and without the knowledge or consent of attending physician or nurse, made the trip, unusually long and fatiguing, for the testator to have the instrument witnessed by their boyhood friends; that the will had been prepared in duplicate, and after they left the hospital both copies of the instrument were delivered by Walter D. Myers to the testator; that the instrument was executed in duplicate so that either copy could serve as a will for probate; that after both copies had been executed and witnessed in due form, and after they had left the bank, where the instruments had been executed, the testator delivered both copies to Walter D. Myers, who took them both to his home in Alva and deposited them in the vault of his bank; that the testator was, at that time, and had been for several months, in a gradual state of decline in health, and so continued to decline for 20 days after the execution of the will, when he went into a stupor, and from that time into complete coma and death; that the testator had on two occasions intimated that it was his purpose not to make a will; and that confidential and fiduciary relations had long existed between the testator and his brother, Walter D. Myers. When all these suspicious circumstances were made to appear, it was incumbent upon the proponents of the will to prove, by satisfactory evidence sufficient to satisfy the conscience of the court, that undue influence was not the inducing cause of the execution of the instrument. Ekern v. Erickson (S. D.) 157 N. W. 1062; Ginter v. Ginter (Kan.) 101 Pac. 634; 28 R. C. L. 145; In re Dale's Estate (Ore.) 179 Pac. 274; Harvey v. Sullins (Mo.) 2 Am. Rep. 491; 4 A. L. R. 975 (2); Mooney v. Olson, 22 Kan. 69.

We think this burden was not sustained by the proponents of the will. If the testator had regained his health, and failed to destroy the will, or make other disposition of his property, it would have been a strong circumstance to negative undue influence, but, under the conditions shown to have existed from the time of the execution of the instrument until his death 34 days later, when he was often in a stupor as a natural result of the sickness from which he was suffering and died, and often under the in-

fluence of narcotics, no presumption can be indulged by his failure to destroy or change the will. If he had so desired the instrument was not available for the reason that it was in the bank of his brother, Walter D. Myers, many miles distant, and Walter D. Myers was present at his bedside only about three days in each week. If he had called for the will and one copy had been presented and destroyed, the other copy would still have been available to the proponents as the will. The fact that the will had been executed in duplicate could easily have slipped the memory of the testator in the situation in which he was placed. One of the attesting witnesses did not remember that the instrument had been executed in duplicate, although he had signed both instruments as an attesting witness.

We are unable to say that the judgment of the trial court is contrary to the clear weight of the evidence, and the judgment is affirmed.

By the Court: It is so ordered.

---

For additional authorities see Benson v. Benson, 125 Okla. 151, 256 Pac. 912; Griffith v. Scott, 128 Okla. 125, 261 Pac. 371.

From a careful review of this entire record, I am firmly of the opinion that this court erred in granting a rehearing herein and that the order granting same should be vacated and set aside and the original opinion filed herein on March 2, 1926, and hereinabove set out, be adhered to. In this connection I desire to incorporate herein in full the report of Commissioner Logsdon on the original petition for rehearing filed herein, same having been referred to him for consideration and for report with his recommendations on same:

Report on Petition for Rehearing.

LOGSDON, C. In this case a motion has been lodged asking that the petition for rehearing be transferred to the Supreme Court proper, and that oral argument be granted thereon. This motion is respectfully referred to the court for its determination without recommendation, but in view of the fact that the court may see proper to grant such motion, I shall not in this report discuss the various propositions raised on the petition for rehearing seriatim, but will only advert briefly to the principal contentions made, viz., that there is no sufficient evidence in the record of a fiduciary relation between Walter D. Myers and the deceased, and that there is no sufficient evidence of undue influence exerted by Walter D. Myers

upon the deceased which induced or influenced the deceased to dispose of his property in the manner he did by the will herein questioned.

This case was argued orally before this divison of the Commission, an extension of time beyond that usually allowed for oral argument being granted in view of the importance of the questions involved and the value of the estate. After this extended oral argument the members of this division were unanimously of the opinion that Walter D. Myers did stand in a relation of trust and confidence to the decedent, and that the facts and circumstances in evidence attending the preparation, execution, and retention of the will by Walter D. Myers were amply sufficient to throw a strong suspicion upon his actions so as to place upon him the burden of proof of showing that the will executed under those circumstances expressed the free and deliberate will and intention of the testator.

In the instant opinion, prepared by RAY, C., the facts and circumstances in evidence attending the preparation, execution, and retention of the will by Walter D. Myers are set forth with considerable particularity, and it is unnecessary in this report to restate the facts as recited in the opinion. It may be observed, however, that before going to the hospital testator had several times stated that it was his intention not to make a will, but to let his property descend under the laws of the state. Within a short time after his reception at the hospital, Walter D. Myers began to have private and confidential conversations with decedent, eventuating in the preparation of the will by his own attorney and its execution in duplicate by the decedent. Why it was thought necessary to execute the will in duplicate so that the original and the carbon copy might either or both serve as an original will is not shown by the evidence, but the circumstances in the case lead to a very definite and logical inference as to the purpose in so doing. If the original will had been called for by the testator and either destroyed or altered, its duplicate could have been probated as an original instrument if no subsequent will had been produced. The reasonableness of this inference is demonstrated by the fact that the attesting witnesses, both bankers, did not remember on the trial that the will was executed in duplicate. In Rood on Wills (2nd Ed.) sec. 190, it is stated:

"Undue influence is not to be inferred from the scrivener being procured by the principal legatee, though the testator lived with him and was old and sick. If the testator was well and strong, there arises no presumption of undue influence or fraud from the fact that the person who drew it up was favored by it. But if the testator was weak and the scrivener benefited, slight circumstances in addition may suffice to cast the burden upon him to show that there was no fraud practiced and no undue influence exercised."

In Howell v. Taylor, 50 N. J. Eq. 428, 26 Atl. 566, it appeared that one of the principal legatees personally gave instructions to the draftsman of the will and paid him for his services; that two of the legatees were present at the execution of the document; that the will subsequently came from their possession. The court stated that these circumstances are sufficient to excite the judicial mind to suspicious scrutiny, and naturally call upon those who participated in the production of the will and who profited by it to satisfy the court that the document was not the product of their unlawful management.

In the early English case of Barry v. Butlin, 1 Curt. 637, Baron Parke announced in simple and precise language the rule which has since been universally recognized in this character of cases, thus:

"If a party writes or prepares a will, under which he takes a benefit, that is a circumstance which ought generally to excite the suspicion of the court, and calls upon it to be vigilant and jealous in examining the evidence in support of the instrument in favor of which it ought not to pronounce unless the suspicion is removed, and it is judicially satisfied that the paper propounded does express the true will of the deceased."

I think no one can read the record in this case and not be impressed by the fact that it is peculiarly one for the application of this rule. The will was prepared in the home town of Walter D. Myers, at a great distance from the hospital where the testator was then under treatment in what proved to be his last illness; it was prepared without the knowledge or consent of the testator's wife and its existence was never divulged to her until after Walter D. Myers had himself filed the will for probate and employed an attorney to represent him and the widow as joint executors of the will. This wife was at the hospital in constant attendance upon her sick husband, but the utmost degree of secrecy attended the preparation and execution of the will, so that the wife was kept in complete ignorance of its existence; after the execution both copies of the will, either or both of which could be used as originals, were

taken by Walter D. Myers to his distant home and locked in his bank vault; after the will was executed Walter D. Myers requested the nurse whenever she called the wife of the testator to his bedside to always notify him, Walter D. Myers, also. At the time of the funeral of the testator, Walter D. Myers denied to the widow any knowledge that a will existed.

I think the opinion prepared by RAY, C., in this case announces the one correct conclusion which can be logically drawn from the facts and circumstances in evidence. I think correct principles of law were announced and applied, and I recommend that the petition for rehearing be in all things denied.

Further comment or citation of additional authorities is wholly unnecessary. This court has repeatedly announced the rule that the only question for determination on appeal in cases of this kind is whether or not the judgment and findings of the trial court are clearly against the weight of the evidence, and, if not, the trial court should be affirmed. Following this rule, the original opinion herein affirmed the trial court, and after a thorough review of this entire record we are firmly of the opinion that the trial court rendered the only proper judgment which could have been rendered under the law and the evidence, and it therefore follows same should be affirmed.

---

PHELPS, J. (dissenting). The opinion in this case was originally written by Commissioner Ray, which opinion was approved by the court. This opinion was, upon petition, withdrawn and a rehearing granted and an opinion written by Commissioner Foster was approved by the court. To this opinion Commissioner Reid filed his dissenting opinion, but the opinion of Commissioner Foster, having received the approval of a majority of the Justices of the court, became the opinion of the court, and under the rules Commissioner Reid's dissenting opinion is not published. However, Mr. Justice Hunt has filed his dissenting opinion incorporating therein the original opinion of Commissioner Ray in toto.

I have carefully examined the record and briefs in this case, as well as the several opinions, and in the light of this record I am unable to agree with either the conclusion reached by Commissioner Foster or the reasoning employed in reaching it. In my judgment the original opinion written by Commissioner Ray reaches the correct conclusion, and I therefore concur in the dissenting opinion filed herein by Mr. Justice Hunt.

Note.—See under (1) 40 Cyc. pp. 1144, 1145, 1164; anno. 28 A. L. R. 778; 28 R. C. L. p. 137; 4 R. C. L. Supp. p. 1800; 5 R. C. L. Supp. p. 1516. (2) 4 C. J. p. 902, §2871; 2 R. C. L. p. 204; 1 R. C. L. Supp. p. 442; 4 R. C. L. Supp. p. 90; 5 R. C. L. Supp. p. 81; 6 R. C. L. Supp. p. 73. (3) 40 Cyc. p. 1165.